840 F.2d 467
 Richard Paul GREENBERG, Plaintiff-Appellee,
v.
Thomas KMETKO and Bruce Weflen, Defendants-Appellants.
Richard Paul GREENBERG, Plaintiff-Cross-Appellant,
v.
Thomas KMETKO and Bruce Weflen, Defendants-Cross-Appellees.
 No. 85-2104, 85-2183.
 United States Court of Appeals,
Seventh Circuit.
 Reheard En Banc Sept. 15, 1987.
Decided Feb. 18, 1988.
As Amended March 9, 1988.
 
 Robert McFarland, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants/cross-appellees.
 Sheldon L. Smith, Chicago, Ill., for plaintiff-appellee/cross-appellant.
 Before BAUER, Chief Judge, CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 COFFEY, Circuit Judge.
 
 
 1
 The defendants-appellants, Thomas Kmetko and Bruce Weflen, appeal from the judgment of the district court that they had violated plaintiff-appellant Richard Greenberg's First Amendment free speech right. The defendants submit on appeal that they should be shielded from liability by qualified immunity. They also challenge the district court's finding that Greenberg's conduct was protected by the First Amendment and argue that the court misinstructed the jury on the standards for establishing illegal retaliatory conduct. Greenberg cross-appeals, arguing that the Fourteenth Amendment should have provided an additional basis for the defendants' liability. We vacate, remand in part, and affirm in part.
 
 I.
 
 2
 Greenberg was a social worker with the Illinois Department of Children and Family Services (the "DCFS"). When Greenberg began working for DCFS's North Area Office in Chicago in May of 1974, he had little or no social work experience or training at all. The record reveals that Greenberg was the least experienced social worker in his unit, and his experience pales in comparison to that of his supervisors.[1] Greenberg's lack of experience and training was noted in a performance evaluation issued by Greenberg's immediate supervisor, Ronald Dombrowski, for the period ending October 1974, when Dombrowski was reassigned to another position in the agency. Dombrowski stated:
 
 
 3
 "However, for whatever personal or emotional reasons, Mr. Greenberg seems to have tremendous difficulty in differentiating his own needs and perceptions from the needs of his clients. At the time I left the unit in October 1974, I was hopeful that perhaps there might be some change in Mr. Greenberg. I thought that because of his particular personality, his inexperience and lack of knowledge about agency policies and social work in general, that he could gain this experience and become effective with his clients...."
 
 
 4
 Defendant Weflen became the supervisor of Greenberg's unit in October of 1974. Defendant Kmetko was the Area Administrator for the DCFS. From the outset of his tenure at DCFS and over the course of several years, Greenberg had several conflicts with his supervisors over department policy.
 
 
 5
 DCFS had a general policy of continuing parental involvement when clinically acceptable, hoping to achieve the best interest of the child as well as maintaining the parent's interest in the child's welfare, a well-accepted social welfare policy[2] later codified by the Illinois legislature.[3] Greenberg's first altercation with his supervisors over the application of this policy occurred in the summer of 1974, shortly after he had assumed his position at DCFS. The case involved a child, Brian C., who had run away from his family and became ill. Brian C. collapsed in a gas station and was taken to a local hospital, where he was released to a juvenile home after he was examined. Three days later, Brian C. once again collapsed in the detention facility and was diagnosed as suffering from severe abdominal cramps.
 
 
 6
 DCFS wanted Brian C. to be reunited with his biological mother. In line with this policy, Weflen directed Greenberg to contact Brian C.'s mother and step-father to arrange for them to pick up Brian C. Greenberg objected to the placement, claiming that the parents were unwilling and unfit to care for the boy. Over Greenberg's protestations, Brian C. was returned to his parents. Shortly thereafter, Brian C. died of an appendix disorder which the trained medical professionals who had examined Brian C. failed to diagnose and treat.
 
 
 7
 Greenberg's second argument with his supervisors occurred at the end of 1974 and early 1975, less than eight months after he joined the agency, over the handling of the case of Richard S. I. Weflen instructed Greenberg to investigate whether the boy could be returned home to live with his parents. Greenberg completed his investigation and reported to Weflen that the parents did not want their son to come home. Nevertheless, Greenberg's supervisors, Kmetko and Weflen, after conferring, determined that a temporary placement for Richard S. I could be made only if the child's parents remained involved in the case, conditioned upon their signing a three-month voluntary placement agreement.[4] Because Greenberg was unable to convince the parents to sign the agreement, to remain involved, and to cooperate, the child remained unplaced. Shortly thereafter Greenberg, while making a status report to the juvenile court on Richard S. I, was questioned by the court as to why the child had not been placed, and in response thereto stated that his superiors in the DCFS, specifically Kmetko and Weflen, were responsible for the failure to place Richard S. I, when in fact it was the failure on Greenberg's part to convince the boy's parents to sign the voluntary placement order that caused the delay in the placement.
 
 
 8
 After placing Richard S. I, Greenberg wrote Kmetko a memo entitled, "Schizophrenic Defense As a Supervisory Reaction to Administrative Agency Policy," in which he advised Kmetko about his difficulties with Weflen concerning the Richard S. I case. Greenberg prefaced his remarks by admitting that his relationship with Weflen was affecting his mental health. He also questioned Weflen's priorities in the letter as to whether Weflen's decisions were based on the best interests of the children or the limited resources of the agency. After reading the memo, Kmetko informed Greenberg that he agreed with Greenberg's assessment of himself that his mental health was a problem.
 
 
 9
 During this period of time, Greenberg's conduct in the office began alienating fellow caseworkers and thus adversely affecting office harmony when he interfered in the case of another caseworker and told others in the unit how to handle their cases. As an example of his meddling, a child had run away from his current placement, and his worker refused to find the child another placement in order to force the child to go back to the old placement. Because Greenberg felt the child was being mistreated, he interjected himself into the case, one to which he was not assigned. Without his co-worker's consent or knowledge, Greenberg gave the child a "Fair and Equal Treatment" card (which entitled the child to receive the help of a state ombudsman) and proceeded to find the boy a new placement for the evening. Weflen informed Greenberg that such conduct would not be tolerated and stated that his relationship with his fellow workers was unacceptable in that he was interfering with and usurping their responsibilities.[5]
 
 
 10
 In March 1975, Greenberg received an adverse performance evaluation from Ronald Dombrowski, his former supervisor, who did the evaluation at the request of Virginia Mextroff, an assistant area administrator. Dombrowski assessed Greenberg as a "troubled young man whose personal problems are interfering with his effectiveness, growth and development as a social worker," and suggested that Greenberg "avail[ ] himself of psychotherapy." Greenberg's inability to deal with Dombrowski's assessment required him to take a leave of absence for approximately a month in order to recover from the emotional and psychological pressures he had created for himself. Greenberg admits that because of his disagreements with his supervisors, his ability to perform his responsibilities as a social worker was impeded and his mental health was affected as well; in fact, he stated that he took the leave of absence because of his admitted difficulty in complying with the agency's placement decision in the Richard S. I case.
 
 
 11
 In September 1975, Greenberg became involved in the case of Richard S. II, a child in the Elgin State Hospital with serious behavioral problems and on medication to control epileptic seizures. Greenberg decided that Richard S. II was not being cared for properly and complained to Phillip Gorman, the assistant guardianship administrator at DCFS. Gorman resented Greenberg's interference and wrote a letter to Kmetko and Weflen requesting that Greenberg be taken off the case.
 
 
 12
 Greenberg attended a meeting of the Children's Rights Council, a community service organization, on October 10, 1975. The speaker there was Jesse McDonald, a deputy director of DCFS. During a question and answer period, Greenberg complained of the department's policy which he characterized as minimizing services to children, especially Richard S. II, who was not mentioned by name. After the meeting, Greenberg and McDonald talked privately, and McDonald assured Greenberg that he would look into Richard S. II's case.
 
 
 13
 Greenberg continued to interfere in Richard S. II's case. Greenberg's superiors received complaints from Dr. Leavitt, head of the hospital where Richard S. II was confined, that Greenberg was meddling in the child's hospital treatment. Greenberg took it upon himself to tell the medical personnel that he believed the child needed in-patient medical care, whereas the child's treating medical professionals determined, and Greenberg's superiors concurred, that Richard S. II could be released from confinement and placed in a non-medical facility. Greenberg disagreed with the agency's decision to discharge the child and place him in a non-medical facility, and in the attempt to override the opinion of his superiors and the medical professionals as to the proper treatment for the child, Greenberg contacted the Director of the Legal Assistance Foundation for assistance to challenge the release, again without the department's knowledge or approval.
 
 
 14
 Soon thereafter, Greenberg was transferred to the Title 20 unit (without incurring a loss of pay) in a position in the administrative division of the department with neither social work responsibilities nor contact with children, but of great importance to the overall operation of the agency because it eliminated the budget deficit that was resulting from the untimely submission of reimbursement requests to the federal government. Greenberg contends that the transfer harmed his health and ultimately forced him to resign.
 
 
 15
 In 1978, Greenberg filed suit under 42 U.S.C. Sec. 1983, alleging that Kmetko and Weflen had deprived him of his First and Fourteenth Amendment rights. The defendants filed a motion for summary judgment, claiming that they could not have known their actions toward Greenberg were unlawful because the Supreme Court did not find interoffice communication protected by the First Amendment until five years after the incident in question, in 1979, and that therefore they acted in good faith and should be protected by qualified immunity. The court denied the defendants' motion and also denied Greenberg's motion for summary judgment on his Fourteenth Amendment claim for constructive discharge. The case was submitted to the jury first on the question of liability. The jury returned a verdict in favor of Greenberg on his First Amendment claim but in favor of Kmetko and Weflen on the Fourteenth Amendment issue. The jury then tried the issue of damages and returned a verdict of $150,000. Kmetko and Weflen appeal the finding of liability under the First Amendment. Greenberg cross-appeals the denial of liability under the Fourteenth Amendment.
 
 II.
 
 16
 Initially, we address the defendants' argument that they are protected by the doctrine of qualified immunity. Under this doctrine, government officials performing discretionary functions are shielded from liability for civil damages unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The principle behind the doctrine is that "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Id. The Supreme Court has stated that this inquiry is a question of law, see Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and that the determination should generally be made at the outset of a case to avoid unnecessary litigation.
 
 
 17
 Under the case law of this Circuit, the district court clearly erred in not applying the doctrine of qualified immunity to shield the defendants from liability for allegedly penalizing Greenberg for First Amendment communications made within the office. It was not until 1979 that the Supreme Court concluded in Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979) that "a public employee [does not forfeit] his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." Hence, this court for some time has applied the doctrine of qualified immunity in cases where public employees were penalized for internal communications made prior to 1979. See Egger v. Phillips, 710 F.2d 292, 314-15 (7th Cir.) (en banc), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). As we stated in Benson v. Allphin, 786 F.2d 268 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986):
 
 
 18
 "As for Benson's in-house expressions prior to his termination, this court's decision in Egger v. Phillips is controlling. In Egger, we stated that, until the Supreme Court's 1979 decision in Givhan v. Western Line Consolidated School District, it was an open question whether on-the-job expressions of public employees were entitled to constitutional protection. A fortiori, constitutional protection for such expressions was not clearly established in 1976. Allphin and Rummel are, therefore, entitled to immunity under Harlow for those claims relating to Benson's pretermination, in-house expression."
 
 
 19
 Id. at 277 (citations omitted). Thus, qualified immunity does shield the defendants from liability for any actions taken against Greenberg for on-the-job communications, and the district court improperly permitted the jury to find the defendants liable for penalizing Greenberg for communications (freedom of speech) made both within and outside the office.
 
 
 20
 Concerning Greenberg's comments made outside the office (the comments to the Juvenile Court regarding Richard S. I and his comments at the meeting of the Children's Rights Council and to the Legal Assistance Foundation regarding Richard S. II), the case must be remanded in light of Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), a case decided after the district court ruled that the defendants were not entitled to qualified immunity. In Anderson, the plaintiffs brought a Bivens action under the Fourth Amendment against Anderson, an FBI agent, based on a warrantless search of their home. The district court granted Anderson's motion for summary judgment on the grounds that Anderson had probable cause and that there were exigent circumstances. On appeal, however, the Eighth Circuit held that Anderson was not entitled to summary judgment on qualified immunity grounds because the right at issue--"the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances," Anderson, 107 S.Ct. at 3038--was clearly established.
 
 
 21
 Anderson filed a petition for certiorari on the qualified immunity issue, and the Supreme Court reversed the judgment of the Eighth Circuit. The Court held that the court of appeals had erred in stating the legal principle at issue in overly abstract terms. The Court stated:
 
 
 22
 "[I]f the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.' "
 
 
 23
 Id. at 3039 (quoting Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (Brennan, J., concurring in part and dissenting in part)). Under the approach taken by the Eighth Circuit, the Court reasoned, "[a] passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated...." 107 S.Ct. at 3039 n. 2. On remand, the district court was to permit Anderson to argue that the law was not clearly established as to the facts of his particular situation.
 
 
 24
 In this case, the district court's analysis of the qualified immunity issue made no reference to the evidence in the record. Instead, the court simply stated:
 
 
 25
 "It has been clear since at least 1968 that employees have the right to be free from retaliation for their exercise of First Amendment rights.... In the present case, plaintiff has alleged such a retaliatory action by defendants. We, therefore, find that the defendants are not protected in the present case by the doctrine of qualified immunity."
 
 
 26
 Greenberg v. Kmetko, No. 78 C 2332, at 7 (N.D.Ill. Aug. 3, 1984). The district court therefore erred in not considering the specific facts of this case. See Anderson, 107 S.Ct. at 3039. Hence, we conclude that this case must be remanded for reconsideration in light of Anderson on the issue of qualified immunity for Greenberg's public statements for the district judge, familiar as he is with the entire record, to apply the new test to it. In deciding the qualified immunity issue on the defendants' motion for summary judgment, the district court should consider all of the undisputed evidence in the record, read in the light most favorable to Greenberg, the non-movant. See Green v. Carlson, 826 F.2d 647, 650 (7th Cir.1987).
 
 
 27
 Furthermore, we are convinced that if any part of Greenberg's statements survive the immunity question, the case must be retried on the questions of liability as well as damages. The district court's failure to distinguish interoffice non-protected speech from statements made outside the office creates a most serious question that the confusion permeated the jury's assessment of damages. Because almost certainly the jury's estimate of damages may have been based in part on the number of the protected statements it thought Greenberg made, the proper procedure in a case such as this is for a retrial on the issue of damages, should the jury find the defendants liable. Nevertheless, we note that it is improbable that Greenberg can obtain damages, in any event, because even if not all of the statements are covered by the defendants' qualified immunity, those that remain (the public statements or some subset thereof) are quite unlikely to have had an impact on their decision to transfer Greenberg.
 
 
 28
 At this juncture, we do not think it necessary to disturb the district court's conclusion that Greenberg's comments qualify as protected speech under the standards established by the Supreme Court in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In Connick, the Court held that it is only when a comment touches on a matter of public concern that free speech rights are at stake. 461 U.S. at 147, 103 S.Ct. at 1690. An employee's right to comment on matters of public importance is not absolute. As the Court explained in Pickering, a court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734-35. Because Greenberg's statements might conceivably have come within the scope of public concern and the government's interest in promoting the efficiency of the public services it performed in this case may not have outweighed Greenberg's right to speak, we elect not to disturb these findings.
 
 
 29
 We point out, however, that the question before us is close because Greenberg did have an adverse effect on office harmony and certainly did not proceed in the least disruptive fashion. As Justice Powell stated in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974):
 
 
 30
 "[T]he Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."
 
 
 31
 Id. at 168, 94 S.Ct. at 1651. (Powell, J., concurring). With this decision, we wish to point out that we remain sympathetic with the plight of the governmental supervisors who might be deterred from firing a disruptive worker because that employee attempted to create an arguable jury issue by "going public" with a grievance under the guise of a violation of his First Amendment rights. We also note that the case at hand does not involve the firing of a worker; rather, the plaintiff Greenberg was merely transferred to an administrative division of the department without incurring a loss of pay. We think it is unusual at the very least to even suspect that a government department head cannot transfer a disruptive worker after that employee has gone public with a dispute and by doing so "bought" himself an alleged First Amendment claim.
 
 
 32
 The defendants in this case also challenge the trial court's instructions to the jury on the standards for finding unconstitutional retaliation for the exercise of First Amendment rights. Specifically, the defendants question the correctness of the jury instruction that states:
 
 
 33
 "In order to recover against any defendant on his free speech claim, the plaintiff [must establish]
 
 
 34
 ....
 
 
 35
 ... [that] the defendant was motivated, at least in part, by a desire to punish or retaliate against plaintiff for his criticism of the [DCFS] policies and practices; and, ... that plaintiff would not have been assigned to the Title 20 Unit had he not criticized the policies and practices."
 
 
 36
 Transcript at 1249 (emphasis added). The defendants submit that this instruction abrogates the proper test, as outlined in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), that requires Greenberg to show that his protected speech or conduct was a substantial or motivating factor in a defendant's decision. When read as a whole, the instructions make clear that the jury must have found that Greenberg's conduct was both a motivating factor and a necessary factor in each defendant's decision to transfer Greenberg. Thus, this instruction was not erroneous. Cf. McGill v. Board of Education, 602 F.2d 774, 779 (7th Cir.1979) (approving instruction under which "the jury could not decide for plaintiff unless it found that her constitutionally protected speech was the motivating factor in defendants' decision to transfer her"). We suggest that in the event this case on remand is submitted to a jury, the district court consider instructing the jury with the equivalent and broadly accepted Mt. Healthy standard.
 
 III.
 
 37
 Greenberg has also filed a cross-appeal asserting that the lower court wrongly denied his motions for summary judgment, directed verdict, and judgment notwithstanding the verdict for his claim under the Fourteenth Amendment that he was denied due process by being constructively demoted and discharged without notice or hearing. He contends that his transfer to the Title 20 unit was an act of punishment because it substituted repetitive, make-work tasks for the contact with children that he experienced as a caseworker. According to Greenberg, this situation caused him great stress which resulted in a loss of income by his having to take a voluntary medical leave of absence and eventually resign.
 
 
 38
 We cannot say that the district court was wrong to reject Greenberg's argument that he established a Fourteenth Amendment violation as a matter of law. This Circuit has expressed a reluctance to find a transfer to the same pay level to be a violation of the Fourteenth Amendment. As this court stated in Parrett v. City of Connersville, 737 F.2d 690, 693 (7th Cir.1984), cert. dismissed, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985):
 
 
 39
 "In Lyznicki v. Board of Education, 707 F.2d 949, 951 (7th Cir.1983), we expressed doubt whether a lateral transfer, involving no loss of pay, could ever be sufficient deprivation to violate the Fourteenth Amendment. A contrary conclusion would subject virtually all personnel actions by state and local government agencies to potential federal damage suits under 42 U.S.C. Sec. 1983--a breathtaking expansion in the scope of that already far-reaching statute, and one remote from the contemplation of its framers."
 
 
 40
 Illinois Personnel Rule 2-470 defines demotion as being moved to a position with a "lower maximum possible salary." Here, Greenberg retained the same salary in the Title 20 unit and retained his title as Social Worker I. As such, it was within the lower court's discretion to allow the jury to determine whether the conditions of Greenberg's employment were so painful as to establish a constructive discharge or demotion. The jury found for the defendants, and we will not disturb its findings. See Knapp v. Whitaker, 757 F.2d 827, 843 (7th Cir.) ("It is well-settled in this circuit that 'a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict.' ") (quoting Spesco, Inc. v. General Electric Co., 719 F.2d 233, 237 (7th Cir.1983)), cert. denied, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).
 
 
 41
 The judgment of the district court is V ACATED, R EMANDED in part, and A FFIRMED in part.
 
 
 42
 KANNE, Circuit Judge, concurring.
 
 
 43
 No area of the law generates more agonizing decisions than those involving child custody determinations. Combining these determinations with the strongly held feelings about free speech and the work of social service agencies, produces a volatile mixture. Such is the situation in this case.
 
 
 44
 In my view, the facts of this case do not produce quite the same pictures that have been developed. I accept the outcome of this difficult case and concur in the result.
 
 
 45
 FLAUM, Circuit Judge, concurring in part and dissenting in part.
 
 
 46
 I concur in the result reached by the majority, save the question of damages. While I believe that Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) mandates a remand of this matter, I adopt Judge Cudahy's view of the damages issue.
 
 
 47
 CUDAHY, Circuit Judge, with whom FAIRCHILD, Senior Circuit Judge joins, dissenting:
 
 
 48
 The original panel majority opinion in this case appears at 811 F.2d 1057. I rely on that opinion of the panel majority as a dissent from the en banc opinion here. Despite the drastic shift in tone and inference from that opinion to this one, the results reached by the two opinions are not that much different. Thus, the panel majority concluded that the defendants were not entitled to qualified immunity for statements made outside the work place, but were entitled to such immunity for internal office communications. The panel noted, however, that there was no way of determining whether liability had been assessed based in whole or in part on actions taken by the defendants in response to internal communications. The panel therefore vacated the judgments as to liability and remanded for a new trial on the issue of defendants' liability for retaliatory action taken in response to communications made by Greenberg outside the office.
 
 
 49
 The en banc majority has now in addition remanded the question of qualified immunity with respect to Greenberg's comments made outside the office for consideration in light of Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The majority contends that, based on Anderson, the district court has erred in not considering the "specific facts" of this case in connection with the issue of qualified immunity. I question whether there exist any heretofore unnoted facts that would entitle defendants to qualified immunity with respect to retaliation for Greenberg's public comments. This circuit already has indicated that the right of public employees to make public statements (as opposed to statements in the workplace) has been clearly established since 1968. Benson v. Scott, 734 F.2d 1181, 1185-86 (7th Cir.), cert. denied, 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984). In Benson, an employee of the Illinois Department of Revenue claimed that the Illinois Attorney General's Office retaliated against him after he told the news media and law enforcement agents about selective enforcement and improprieties in court. This court noted that
 
 
 50
 [t]he right of employees to be free from retaliation for their exercise of first amendment rights has been clear since at least 1968, when the Supreme Court decided Pickering v. Board of Education.... The defendants cannot claim that the law was unclear in 1977, when the events at issue in this case allegedly occurred.
 
 
 51
 Id. at 1185. Since the majority here has suggested no facts which would distinguish the instant case from the Pickering model, see Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a remand for consideration in light of Anderson is wholly unnecessary. In Pickering a teacher publicly criticized the school board. Here a social worker publicly criticized a child welfare department.[1] Pickering is thus the most unambiguous notice to public employers of the consequences of retaliation for public comments about matters of public concern (for example, the policies and practices of public agencies). Most importantly, the case before us involves a simple exercise of first amendment rights--not the esoteric, fact-dependent fourth amendment rights at issue in Anderson v. Creighton.
 
 
 52
 The present issue is in no way fact-dependent, and I can imagine no facts which would take, for example, Greenberg's remarks to the Children's Rights Council outside the Pickering pattern of public employees' having a protected right to criticize government policy in a public forum without retaliation. The en banc majority opinion makes little effort to justify this remand in light of Anderson v. Creighton and to my way of thinking there is no justification for it.
 
 
 53
 In important respects the majority's errors here appear most blatantly in its statement of the "facts" of the case. The majority has made a studied effort to depict Greenberg as a psychological basket case disrupting for no good reason the wise and benevolent initiatives of the DCFS. In this respect, the majority has disdained its own pronouncement that the evidence be viewed on remand in the light most favorable to Greenberg. The majority has attempted to paint Greenberg as simply inexperienced, untrained, emotionally shattered and as a simple saboteur. It is, of course, not unusual for dissenters to be pictured as mental cases and their objections to the conventional wisdom to be diagnosed, by those charged with maintaining the status quo, as symptoms of derangement. Some societies quiet such objectors by committing them to a mental institution.[2] It does not seem to me the appropriate role of this court to focus upon Greenberg's "personal problems" to the exclusion of everything else or to conclude that his objections to department policy are the mere ravings of a lunatic. Dissenters and whistleblowers rarely win popularity contests or Dale Carnegie awards. They are frequently irritating and unsettling. These qualities, however, do not necessarily make their views wrong or unhelpful, and the Supreme Court has concluded that it is in the public interest and consonant with the first amendment for them to express opinions on subjects of public concern without fear of retaliation.
 
 
 54
 In describing Greenberg and his clashes with DCFS policy, the majority makes a calculated effort to put Greenberg always in the wrong. We have noted the heavy-handed emphasis upon Greenberg's alleged mental problems. But there also are attempts to deprive Greenberg of possible credit even when, at least on the face of things, he might have been on the right track. Thus, the majority describes the insistence of the DCFS, over Greenberg's strenuous objection, that the sick Brian C. be returned to his mother and stepfather, who had resisted having the child back in their home. Within twenty-four hours of his return Brian C. was dead. Quite gratuitously, the majority ascribes this tragedy to the doctors--presumably to make certain that no blame falls on the parents. I do not believe it is our proper task to assign blame. It is possible that the jury felt that Greenberg and not his superiors correctly assessed the appropriate custody for Brian C.
 
 
 55
 The jury awarded Greenberg $150,000 damages. This suggests that they may have believed him a courageous objector to misguided policies rather than an inept mental case merely rubbing his peers and superiors the wrong way. To the extent that the majority's belabored "facts" are relevant (and I think that few are relevant) their resolution is for the jury and not for us. After he has won a jury verdict, Greenberg is entitled to have the inferences drawn in his favor, not wrenched about to conform to the preconceptions of the majority. For example, the majority has somehow been able to put the blame on Greenberg for the failure to place Richard S. I, when Greenberg's only role was his inability to convince the boy's parents to sign a voluntary placement order. This is simply unfair. Rather than continue in this vein, I simply suggest to the interested reader a perusal of the statement of the facts in the original panel opinion at 811 F.2d 1057. That statement makes no effort to conceal Greenberg's apparent frailties but, on the other hand, does not strain to demean him.
 
 
 56
 Finally, the majority has ordered a new trial on damages. There is no principled basis for this prescription. Whatever the basis of liability--the public statements or the internal office communications--once it is established that there is liability resulting from the transfer to the Title 20 unit, the damages flow from the transfer not from the making of protected statements as the majority suggests. A properly instructed jury has already determined what the damages were, and no objection has been made to the amount of the damages. I am therefore at a loss to understand how this issue can properly be reexamined. No doubt the result reached by the majority in this respect reflects its view that the damages are "too high." As I have noted, I think their perceived magnitude reflects primarily the chasm between the evaluation of Greenberg by the jury (which saw and heard him) and his evaluation by the majority. There is no basis in logic, however, for saying that the damages should be any different whether they arose from public statements or private ones. Again the differences in result between the panel opinion and that of the en banc majority here are not monumental. My most emphatic objection is to the tone of the majority opinion which reflects the heavy-handed preemption of the role of the jury by an appellate court. I think this approach is unfitting, and I therefore respectfully dissent.
 
 
 57
 RIPPLE, Circuit Judge, with whom FAIRCHILD, Senior Circuit Judge, joins.
 
 
 58
 I would vacate the order granting rehearing en banc on the ground that it was improvidently entered. See Fed.R.App.P. 35. See generally United States v. Rosciano, 499 F.2d 173 (7th Cir.1974).
 
 
 
 [1]
 The DCFS had four levels of social workers, I-IV; the levels related to the experience of the social worker. Greenberg was classified at the very lowest of experience levels, Level I. His supervisors were at least Level III social workers. Thus, Greenberg was the least experienced of the lowest classification of social workers. He joined the Department of Children and Family Services in 1974 with only one year of experience in a field related to social work
 
 
 [2]
 See In re Adoption of R.P.R., 95 Wis.2d 573, 581, 291 N.W.2d 591, 595 (Ct.App.1980) (" 'As a general matter, but not invariably, the child's best interest will be served by living in a parent's home.' " (quoting La Chapell v. Mawhinney, 66 Wis.2d 679, 683, 225 N.W.2d 501, 503 (1975))); In the interest of T.G., 147 Ill.App.3d 484, 101 Ill.Dec. 188, 191, 498 N.E.2d 370, 373 (1986) ("Our courts have long recognized the inherent right of parents to the society and custody of their children and have held that such rights should not be abrogated without compelling reasons.")
 
 
 [3]
 "Case Plan. With respect to each Department client for whom the Department is providing placement service, the Department shall develop a case plan designed to stabilize the family situation and prevent placement of a child outside the home of the family, reunify the family if temporary placement is necessary, or move the child toward the most permanent living arrangement and permanent legal status. Such case plan shall be reviewed and updated every 6 months."
 Ill.Rev.Stat. ch. 23 Sec. 5006a (emphasis added).
 
 
 [4]
 Once the juvenile court committed a child to the care of the DCFS, it was not required to secure parental consent to place a child
 
 
 [5]
 The other social workers complained to the unit supervisor and office administrator about Greenberg's unwarranted interference in their cases. They also criticized Greenberg for meddling in another worker's case and ultimately became quite hostile toward him
 
 
 [1]
 For example, Greenberg made public remarks at a meeting of the Children's Rights Council in October of 1975 in which he criticized the department policy of "minimizing services to children." See supra p. 471
 
 
 [2]
 Interestingly, the "Title 20 Unit" to which Greenberg was transferred had become known as the "monkey cage" and the "punishment unit." Record at 195, 427-28, 576, 605; Defendants' Opening Brief at 21. Thus the majority is disingenuous in implying that Greenberg's transfer should not be viewed as retaliatory. See supra p. 474