**Rustum NAEEMULLAH Plaintiff,**

v.

**CITICORP SERVICES, INC., Citibank, N.A., and David Budinger, Defendants.**

No. 96 C 8093.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 17, 1999.

James R. Figliulo, Peter A. Silverman, Figliulo & Silverman, Chicago, IL, for plaintiff.

Richard Elliot Lieberman, Michael Ross Phillips, Ross & Hardies, P.C., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

KENNELLY, District Judge.

Rustum Naeemullah is Pakistani and Muslim. In May 1993, after 12 years with Citicorp Services, Inc. and Citibank, N.A., he became a credit officer and vice-president for the company's Global Cash Management Services (GCMS) unit in Chicago. Naeemullah's exact title was "Director of Credit" for GCMS (a U-level position),[1] but he made no bones about the fact that he wanted to be a "Senior Credit Officer" or "SCO."

Citicorp bestows the coveted SCO designation on a select group of employees; only about 600 of Citicorp's 100,000 employees have made the SCO cut. The designation increases a credit officer's credit approval authority, allowing approval of up to $5 million. The designation is "sacred" within Citicorp. Though not a promotion per se, the SCO designation is the bank's way of saying "we trust you and think you have the experience and personal characteristics necessary to lead." To become an SCO, a candidate must have "wide and diverse experience" including 10 years in consumer or commercial lending and "a wide range of capabilities," and must possess certain delineated personal traits including integrity, honesty, sound judgment and common sense, balanced and independent judgment, decisiveness and leadership. Citibank's Core Credit Policies, pp. 3–4 to 3–5 (May 1995). To become an SCO, the candidate must be nominated by two "sponsoring" SCOs, the nomination must be endorsed by a "Line Manager [SCO] with at least a Level 2 Credit Limit, the Executive Vice President and a Member of the Credit Policy Committee," and finally the nomination must be approved by the Chairman of the Credit Policy Committee. *Id.* at 3–5.

Naeemullah never made it past step one. Although Figliozzi nominated him for the SCO designation, in September 1995 Naeemullah's Division SCO, David Budinger, refused to second Naeemullah's nomination. From there Naeemullah's career at Citicorp began a downward spiral. In July or August 1996, Naeemullah was transferred to a temporary position in New York; six months later he was "job discontinued"—Citicorp's way of saying "fired."

After exhausting his administrative remedies, Naeemullah sued Citicorp, alleging that Budinger refused to second his SCO nomination because of Naeemullah's race, national origin, color and religion, and that the bank transferred him to New York and then fired him in retaliation for complaining about Budinger's discrimination. On November 6, 1997, Naeemullah amended his complaint to add defamation and tortious interference with business relationship claims against David Budinger personally. He claims Budinger made nine defamatory statements about him and that Budinger intentionally and maliciously destroyed his career at the bank. The case is before the Court on Citicorp's and Budinger's motions for summary judgment. For the reasons explained below, the Court denies Citicorp's motion, but grants Budinger's motion.

## FACTUAL BACKGROUND

Before turning to the merits, we need to sketch in a more complete factual picture. As we said, Naeemullah was up front with John Figliozzi, Naeemullah's boss at GCMS and himself an SCO, about wanting to become an SCO, and when he hired Naeemullah, Figliozzi genuinely seemed to believe that goal was attainable. Naeemullah's annual performance reviews were generally quite good, suggesting that the

---

1. Jobs at the bank are ranked from A to Z, with Z being the highest on the corporate ladder.

SCO designation was within Naeemullah's grasp. In his evaluations for both 1993 and 1994, Figliozzi rated Naeemullah as "outstanding," the second best performance category. In his 1993 review of Naeemullah, Figliozzi wrote: "[Naeemullah] should actively complete any formal requirements and establish his credentials with current management during 1994, such that a Senior Credit Officer nomination should be a reality. Rustum is clearly ready for this next level of his professional development, and this is a reasonable short term goal." Performance and Development Review for the period from 6/1/93 to 12/31/93, at 7.

Similarly, in his 1994 review of Naeemullah, Figliozzi wrote:

During the year Rustum worked hard to accomplish the goals set forth by the DCO [Division SCO] and his supervisor. He has demonstrated a good level of technical experience, an understanding of credit policies and procedures, and sensitivity to process management such that he is ready for an SCO assignment. To further this objective, he will be asked to play a more direct role in providing the DCO with ongoing assessments and progress reports. Performance and Development Review for the period from 1/1/94 to 12/31/94, at 5.

Figliozzi reiterated in the 1994 review that Naeemullah "has clearly demonstrated his expertise and professional judgment such that he is ready to move into a more senior position." *Id.* at 6.

But Naeemullah's 1994 review was not unconditionally glowing. Figliozzi wrote that Naeemullah could "benefit from improving his 'people' skills (ie 'managing upwards'). While he enjoys the professional respect of his peers and senior officers within the Division, he has a tendency to be abrasive on occasion." *Id.* at 5. Additionally, while noting that the SCO designation was "reasonable," Figliozzi stated that Naeemullah's SCO nomination "will depend not only on credit skills, but also on interpersonal skills at a senior level. This will be emphasized and accomplished through asking Rustum to assume responsibility for directly keeping the DCO advised and involved in his projects going forward." *Id.* at 6. Naeemullah read and signed both the 1993 and the 1994 reviews, acknowledging that the contents were fair and accurate.

Despite his reservations about Naeemullah's people skills, Figliozzi recommended that the bank send Naeemullah to its Senior Risk Seminar, which is traditionally viewed within the bank as the precursor to getting the SCO designation. On Figliozzi's recommendation, in April 1995, the company sent Naeemullah to Switzerland to attend the seminar. Figliozzi nominated Naeemullah for SCO in late August 1995. In mid-September, Figliozzi's boss, David Budinger, who had taken over as Division SCO in July 1995, told Figliozzi he would not second Naeemullah's nomination. Neil Volweider, who had been Division SCO before Budinger took over, agreed that Naeemullah was not SCO material. After learning that Budinger refused to second his nomination, Naeemullah initiated a "problem review," Citicorp's internal investigation process whereby the bank's human resources personnel and independent human resources counselors gather the facts to determine whether an employee was wronged. In his problem review, Naeemullah claimed Budinger tanked his SCO nomination because Naeemullah is Pakistani and Muslim.

Although Figliozzi initially believed Naeemullah worthy of the SCO designation, by the end of 1995 or early 1996, he was rethinking his nomination. Figliozzi perceived that Naeemullah was extremely bitter about his SCO nomination and testified that Naeemullah became hostile and aggressive after his nomination was canned. Naeemullah's 1995 performance evaluation, which Figliozzi completed after Naeemullah initiated the problem review, was largely negative:

Rustum's "people skills" was highlighted in his previous performance appraisal as an area needing improvement. My as-

sessment of his 1995 performance is that he has not demonstrated an improvement in this regard.

Although Rustum accomplished his objectives for 1995 as described in the foregoing section of this evaluation, he continued to display abrasive, and at times antagonistic, behavior which in my opinion has overshadowed his performance on his MBO. Several confrontations with his co-workers, peers, and myself required more time than I felt reasonable to be spent investigating incidents, and caused interference with the efficient operation of the department. Rustum had discussions regarding the appropriateness of his behavior with me, with my supervisor [David Budinger] and with representatives from H.R. during the year.

In summary, while he is a competent Credit Officer, he has failed to behave as is generally expected of a V.P. who is otherwise qualified as a candidate for a Senior Credit Officer position. Given the appropriate change in attitude, I have no doubt that Rustum could enjoy a the continuation of a successful career with this organization. Performance and Development Review for period from 1/1/95 to 12/31/95, at 6.

In a draft version of the review, Figliozzi rated Naeemullah at "did not meet expectations," the lowest category ranking. But for the final version of the review, Naeemullah's ranking was upgraded to "met expectations," the second best performance category.[2]

Naeemullah's 1995 review addressed another issue: the bank's recent decision to relocate the GCMS unit from Chicago to Stamford, Connecticut. Figliozzi wrote:

Given the reorganization of the Credit team into product-specific roles, and the pending relocation of positions (excluding Travellers Cheques) to Stamford during 1996, Rustum's existing position in Chicago will be eliminated.

Rustum should seek a position which will provide him an opportunity to improve his relational skills. It is anticipated that such a change will occur during the Second or Third Quarter, 1996. Performance and Development Review for the period from 1/1/95 to 12/31/95, at 7.

Naeemullah refused to sign his 1995 review.

In connection with the relocation of the GCMS unit, the bank required Chicago employees interested in moving to interview for spots in Stamford. Several positions (U-level and lower) were available to Naeemullah, but he elected not to pursue them. The bank contends Naeemullah voluntarily decided to look elsewhere because he wanted a V-level position, and no such spots were available in Stamford. Naeemullah contends the bank discouraged him from accepting a job in Stamford, where Budinger would have been his boss. The bank also offered Naeemullah a V-level position in Pakistan, which he initially accepted and then rejected, ostensibly because the value of the local currency would have made his salary worth less than he was making in Chicago. In the end, Naeemullah accepted a short-term position in New York. Citicorp contends that it told Naeemullah up front that after his New York assignment was over, he would have to find another job within the company or face job discontinuance. Naeemullah contends that the human resources people initially told him he could face job discontinuance after the New York position ended, but they later told him that he would not be let go and that they would help him find another position at the bank.

In August 1996, while Naeemullah was in New York, the company's human resources people wrapped up Naeemullah's problem review; the company concluded that Naeemullah's SCO nomination had been considered consistently with applica-

---

**2.** With the 1995 performance reviews, Citicorp apparently switched from a 5–tier ranking (exceptional; outstanding; good; needs improvement; unsatisfactory) to a 3–tier ranking (exceeded expectations; met expectations; did not meet expectations).

ble criteria and that the rejection was not the result of discrimination. In February 1997, Naeemullah's New York boss, Gene Sweeney, told Naeemullah it was time for him to go. The company made no effort to find Naeemullah another job (it's not entirely clear that Naeemullah himself made any efforts in that regard); instead, in June 1997, the company sent him packing.

## DISCUSSION

Citicorp seeks summary judgment on Naeemullah's Title VII claims. Budinger seeks summary judgment on Naeemullah's defamation and tortious interference claims. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment must show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that judgment as a matter of law would be inappropriate here. *Hedberg v. Indiana Bell Co.,* 47 F.3d 928, 931 (7th Cir.1995). When considering the evidence presented on a summary judgment motion, the Court may not make credibility determinations or choose between competing inferences. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We draw all reasonable inferences from the record in the light most favorable to the non-moving party. *Hedberg,* 47 F.3d at 931. Under this standard, we must deny Citicorp's motion and grant Budinger's motion.

### A. *Citicorp's Motion for Summary Judgment*

█ Naeemullah alleges that Citicorp discriminated against him based on his race, religion, national origin, and color, and that Citicorp retaliated against him when he complained about the discrimination. To prove his claims, he would have to show among other things that he was subjected to an adverse employment action. *See Smart v. Ball State University,* 89 F.3d 437, 440 (7th Cir.1996); *Spencer v. AT&T Network Systems,* No. 94 C 7788, 1998 WL 397843, at *3 (N.D.Ill. July 13, 1998). Citicorp argues that Naeemullah cannot meet this burden, and therefore argues that it is entitled to summary judgment on Naeemullah's Title VII claims. Specifically, Citicorp argues that the company's decision not to make Naeemullah an SCO cannot be considered an adverse employment action because the SCO designation is not a promotion and it did not involve any increase in salary or benefits. Similarly, Citicorp argues that Naeemullah's transfer to New York and his ultimate job discontinuance are not actionable adverse employment actions because they both came after Naeemullah chose to reject a V-level promotion in Pakistan.

█ "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441. "A materially adverse change might be indicated by a termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty National Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993). But "adverse actions can come in many shapes and sizes." *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996). And the question of whether an employee has suffered such an action will normally depend on the facts of each situation. *See Bryson v. Chicago State University,* 96 F.3d 912, 916 (7th Cir.1996). "The question ... can be resolved on summary judgment only if the question is not fairly contestable." *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 273–74 (7th Cir. 1996).

Citicorp has failed to establish as a matter of law that the rejection of the SCO designation is not an adverse employment action; in other words, the matter is fairly contestable, and summary judgment is inappropriate. The mere fact that the SCO title carried no increase in salary or benefits is not controlling; the Seventh Circuit has recognized that an "adverse job action is not limited solely to [changes in] pay or monetary benefits." *See Smart,* 89 F.3d at 441 (quoting *Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987)). In *Bryson v. Chicago State University,* the defendant university stripped the plaintiff, a tenured full professor, of her title (she went from being "Special Assistant to the Dean" to being "bibliographic instruction librarian"), and banished her from university committee work, though her salary and benefits remained the same. Plaintiff sued under Title VII. The district court found that the committee work was not essential to a tenured academic (expressing skepticism that anyone would want to serve on committees anyway) and found that the loss of a title had speculative value at best. Based on these findings, the district court concluded that plaintiff failed to demonstrate an adverse employment action and granted summary judgment for the defendant. 96 F.3d at 916. The Seventh Circuit reversed, recognizing that "[t]he subtle indicia of job status and reward . . . may, in a particular institution, take on an importance that may be far greater in context than would appear on the outside—indicia like honorary or in-house titles (that may have no budgetary effect, unlike their administrative counterparts) and committee assignments." *Id.* at 916–17.

In this case, the evidence shows that the SCO designation was a big deal within the bank. Neil Volweider, who was Division SCO at GCMS before David Budinger took over in July 1995, characterized the SCO initial as "a personal designation which attests to your abilities and particularly leadership skills, role model as credit officer, and your judgment." Volweider Deposition, p 5. He stated that "in the credit world, [the SCO] endorsement is meaningful"; the designation is "distinctive" and "sacred" and he "hold[s] it 'in very high regard.'" *Id.* at 5, 7. Similarly, John Figliozzi testified that the SCO designation is a "recognition of [one's] capabilities as a credit officer." Figliozzi Deposition, p. 53. He characterized the SCO initial as follows:

> There are certain senior level positions in the bank where the title is granted to give you a broader range of authority to facilitate doing your job. But you can do the job without the title, you just don't have the same level of authority. So that means more people, other people have to be more involved in your doing the job.
>
> *Id.* at 65.

Figliozzi also testified that "the authority that goes with a senior credit officer title is a recognition of advanced skills and therefore that's a good thing." *Id.* at 81. Finally, he admitted that although the SCO designation is not a prerequisite of the job, the majority of the senior credit positions are held by SCOs. *Id.* at 58. Notably, both Volweider and Figliozzi were SCOs.

Although the SCO designation was technically not a promotion, those initials showed the world that the bank thought the particular employee to be of proven personal character and that the bank trusted the employee to handle its most important transactions. Left unstated, but clear as day, is the fact that the company's refusal to process an employee's SCO nomination would demonstrate that the company was less than wowed by the employee's professional skills and personal character. A jury could reasonably find that the situation presented here is not unlike a failure to promote scenario, which can unquestionably constitute an adverse employment action. *See Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998)(adverse employment action is a "significant change in employment status, such as hiring, firing, *failing to promote,* reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits.") (emphasis added). The Court therefore denies Citicorp's motion for summary judgment on Naeemullah's discrimination claim.

■ Citicorp also argues that it is entitled to summary judgment on Naeemullah's retaliation claim. Specifically, Citicorp argues neither Naeemullah's transfer to New York, nor his ultimate job discontinuance, can constitute adverse employment actions because those actions came *after* Naeemullah voluntarily rejected a promotion to a V-level position in Pakistan. The cases on which Citicorp relies, *Greenberg v. Kmetko,* 840 F.2d 467, 475 (7th Cir.1988), and *Spring v. Sheboygan Area School Dist.,* 865 F.2d 883 (7th Cir.1989), deal with lateral transfers (i.e., same level, same pay, same benefits) and constructive discharge, neither of which has been alleged here. The New York job Naeemullah accepted was not a lateral transfer; it was a temporary assignment. And Naeemullah wasn't *constructively* discharged; he was actually discharged (job discontinued, in Citicorp's corporate parlance).

When Citicorp decided to move its GCMS operation to Stamford it eliminated some positions and relocated others. Citicorp contends that when it decided to eliminate Naeemullah's job, it offered him at least two attractive options—namely, a permanent U-level position in Stamford and a permanent V-level position in Pakistan—and he rejected them both out of hand, choosing instead to purse a dead-end, short-term position in New York. If a jury finds that to be the case, Naeemullah's retaliation claim will ring hollow. But Naeemullah presented evidence from which a trier of fact could conclude that Naeemullah went to New York because he had no other choice. Naeemullah testified that the bank discouraged him from accepting a position in Stamford, and Bu-

dinger, who was going to run the Stamford operations, admitted that he told Naeemullah there was no place for him there. *See* Naeemullah Deposition, pp. 587–88; Budinger Deposition, p. 301. Naeemullah also testified that the position in Pakistan, though technically a promotion, would have entailed a significant reduction in pay. Citicorp disputes that the Pakistan job's total compensation package was less than the Chicago package, but the bank does not directly refute that Naeemullah's base salary could have gone down because of the currency exchange rate. From this evidence, a trier of fact could conclude that the bank was trying to punish Naeemullah for pursuing the problem review against Budinger. The Court therefore denies Citicorp's motion for summary judgment on Naeemullah's retaliation claim.

None of this is to say that Naeemullah will necessarily win on his Title VII claims. Much of this case will come down to credibility determinations and questions of how much weight to attach to various bits of evidence, both of which we leave for the jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sarsha v. Sears Roebuck & Co.,* 3 F.3d 1035, 1041 (7th Cir. 1993) (on summary judgment, court neither makes credibility determinations nor chooses between competing inferences; rather, these are functions for a jury).

### B. *Budinger's Motion for Summary Judgment*

On November 6, 1997, Naeemullah sued Budinger in his individual capacity for slander and libel *per se* and for tortious interference with employment relationship. Budinger moves for summary judgment on both claims.

In his defamation claim, Naeemullah alleges that Budinger made nine defamatory statements against him. The following table summarizes the statements, to whom and when they were allegedly made.

| STATEMENT | PUBLICATION | DATE(S) OF PUBLICATION |
| --- | --- | --- |
| (1) Naeemullah has interpersonal skills problems | Budinger to Naeemullah; and | September 1995 |
|  | Republished to Cathy Sacks and Del Pulido | during problem review (sometime between July 1995 and Aug. 1996) |
| (2) Naeemullah failed to take a leadership role within the credit department | Budinger to Naeemullah; and | November 1995 |
|  | Republished to Sacks and Pulido | during problem review (sometime between July 1995 and Aug. 1996) |
| (3) Naeemullah sent emails "all over the world" accusing Budinger of racism | Budinger to Sacks and Pulido; and | late 1995 |
|  | Republished by Sacks to Howard Stein and Pulido | unknown |
| (4) Naeemullah's professional abilities were run of the mill | Budinger to Stein | unknown |
| (5) Naeemullah did not perform well at the Senior Risk Seminar | Budinger to Figliozzi; and | sometime in 1995 |
|  | Republished to Sacks and Pulido | unknown |
| (6) Naeemullah "turned up missing" while Figliozzi was away and demonstrated "amazingly bad judgment" | Written by Fred Hunt in internal memorandum (based on Budinger's representations); and | December 19, 1995 |
|  | Republished to Sacks and Pulido | unknown |
| (7) Naeemullah was responsible for a low internal audit in the Chicago GCMS unit | Budinger to Naeemullah; and | September 1995 |
|  | Republished to Sacks and Pulido | unknown |
| (8) Naeemullah failed to get approval for certain credit models | Written by Budinger in an email to Sacks; and | January 19, 1996 |
|  | Republished to Pulido | unknown |
| (9) Budinger's lawyer would have fun kicking Naeemullah out of the country | Budinger to Sacks | sometime in 1995 |

Budinger argues that he is entitled to summary judgment because the allegedly defamatory statements were all made more than a year before Naeemullah filed his complaint against Budinger on November 6, 1997. Under Illinois law, which the parties agree applies, an action for slander or libel must be commenced within one year after the cause of action accrues. 735 ILCS 5/13–201. The cause of action generally accrues on the date the defamatory material is published to a third party. *Bakalis v. Board of Trustees of Community College District No. 504*, 948 F.Supp. 729, 736 (N.D.Ill.1996). Applying this rule here, all of the alleged defamatory state-

ments would be barred by the statute of limitations. In some instances, Naeemullah has alleged and argued publication dates that show conclusively that the statements were published or republished before November 6, 1996 and therefore are barred. In others, Naeemullah has given vague timeframes (such as, "during the problem review"); in still others, he offered no dates at all. These responses are not sufficient to defeat Budinger's statute of limitations argument. *See Colucci v. Chicago Crime Commission*, 31 Ill.App.3d 802, 808–09, 334 N.E.2d 461, 466 (1975) (where statute of limitations is involved, plaintiff must prove that statements were made on a precise date; alleging publication "on or about" a specific date or "subsequent to" a specific date, without accompanying details or information, is not enough).[3]

■ Publication dates notwithstanding, Naeemullah argues that the statute of limitations was tolled for some of the allegedly defamatory statements under Illinois' "discovery rule." Under this rule, the limitations period does not begin to run until the plaintiff discovers the defamation. *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 61 Ill.2d 129, 334 N.E.2d 160 (1975); *Swider v. Yeutter*, 762 F.Supp. 225, 228 (N.D.Ill.1991). Naeemullah seeks to invoke the discovery rule for statements (1), (4), (5) and (8). He argues that he did not know about statements (4) and (5) until October 1997, when Budinger admitted at his deposition that he had made these statements, and that he did not learn about statements (1) and (8) until April 1997, when Citicorp produced for the first time the documents containing these statements.

■ Assuming, without deciding, that the discovery rule would apply here, we would still need to decide whether statements (1), (4), (5) and (8) are action-

able. We find that they are not, for at least two reasons. First, the statements are privileged. To determine whether a privilege to speak exists under Illinois law, the Court looks to the particular occasion in which the communications were made. *See Jones v. Western & Southern Life Insurance Co.*, 91 F.3d 1032, 1035 (7th Cir.1996). The Illinois Supreme Court has identified three general situations in which a privilege exists to make what might otherwise be defamatory statements: (1) where some interest of the person who publishes the defamatory matter is involved; (2) where some interest of the person to whom the matter is published or of some other third person is involved; and (3) where a recognized interest of the public is concerned. *See Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill.2d 16, 188 Ill.Dec. 765, 619 N.E.2d 129, 135–36 (1993). The first two situations existed here. Budinger had an interest—even a duty—to make these statements, both as Naeemullah's Division SCO and as the alleged villain in Naeemullah's problem review. In fact, Naeemullah's initiation of the problem review made the republication of Budinger's statements inevitable, and he should not now be heard to complain that Budinger gave his side of the story to the human resources people investigating the review. *See Sullivan v. Conway*, 157 F.3d 1092, 1098 (7th Cir. 1998) (the law should not allow a plaintiff to sue a corporate employee for statements made in an internal corporate meeting at which the person's professional qualifications are in issue; "if such suits are allowed, the free and frank exchange of ideas, facts, and opinions bearing on professional competence will be inhibited"). Moreover, Budinger made the allegedly defamatory statements to corporate personnel with an interest in hearing about Naeemullah's professional performance

---

**3.** We note here that we are dealing only with alleged publication or republication to third parties; publication to Naeemullah is not "publication" for purposes of a defamation claim. *See Vickers v. Abbott Laboratories*, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1107 (1999) ("publication requires that the defamatory statements were communicated to some person other than the plaintiff").

and demeanor. Statements (1), (5) and (8) were made to the human resources personnel charged with investigating Naeemullah's problem review; statement (4) was made to the head of Naeemullah's business group.

The privilege, of course, is conditional and may be lost if abused. *See Cianci v. Pettibone Corp.*, 298 Ill.App.3d 419, 426, 232 Ill.Dec. 583, 698 N.E.2d 674, 680 (1998) ("an abuse of the privilege may consist of 'any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.'"). But there is no evidence that Budinger abused his privilege in this case. To the contrary, the statements about which Naeemullah complains were made to the proper parties in the context of a professional situation that necessarily called for the honest appraisal of Naeemullah's skills and professional background.

Additionally, statements (1) and (4) are nonactionable statements of subjective opinion. Only readily verifiable statements of fact may form the basis of a defamation claim. *See Sullivan*, 157 F.3d at 1097. Like the statements alleged in *Sullivan* (plaintiff is a poor lawyer), Budinger's statements that Naeemullah has poor interpersonal skills and run-of-the-mill professional abilities are "so difficult to verify or refute that [they] cannot feasibly be made the subject of inquiry by a jury." *Id.* Budinger was entitled to express his honest opinions of Naeemullah's professional abilities and interpersonal skills—indeed, as an SCO asked to second Naeemullah's nomination to that prestigious rank, it was incumbent upon him to do so—without having to face liability for defamation. Budinger is entitled to summary judgment on Naeemullah's defamation claim.

In addition to the defamation claim, Naeemullah alleges "tortious interference with business relationship," referred to in the Illinois cases as tortious interference with prospective economic advantage or tortious interference with business expectancy. Naeemullah argues that Budinger intentionally interfered with his employment relationship by making false statements about Naeemullah's professional competence, coercing employees to make false statements about Naeemullah and altering Naeemullah's performance evaluation to falsely reflect that Naeemullah's performance was unsatisfactory. Budinger argues that he cannot be held liable for tortious interference because he acted at all relevant times as Citicorp's agent.

A claim for tortious interference with business expectancy usually lies only against a third party who causes the employer/employee relationship to end. *Mustafa v. Illinois Department of Public Aid*, No. 96 C 5177, 1997 WL 194980, at *5 (N.D.Ill. Mar.14, 1997). Corporate officers, supervisors and co-workers—even those who have a hand in terminating the employee—"are privileged to act on behalf of the corporation, using their business judgment and discretion." *Id.* "The policy behind the 'corporate officer' privilege is to give officers and directors more freedom in their decisionmaking process and not dissuade them from taking action on behalf of the corporation for fear of personal liability." *Kopystecki v. Quality Books, Inc.*, No. 92 C 1742, 1992 WL 345037, at *5 (N.D.Ill. Nov.12, 1992). When the privilege applies, as it does here, the plaintiff is required to show that the defendant acted maliciously. *Id.* Thus Naeemullah must show that Budinger acted with personal animosity against him and that he acted for his own personal interests—contrary to those of the corporation. *Id.; Mustafa*, 1997 WL 194980, at *5 (citing *Fuller v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1333 (7th Cir.1983)).

Naeemullah argues that Budinger acted maliciously and to further his own personal bigotry. But he has offered no evidence to back that argument. There is no evidence that Budinger coerced anyone to make false statements about Naeemullah; there is no evidence that Budinger altered

Naeemullah's performance evaluation. The only involvement Budinger had in Naeemullah's performance evaluation was to approve an *upward* move from "does not meet expectations" to "meets expectations." The decision to rate him at "does not meet expectations" initially rested solely with John Figliozzi and Catherine Sacks, the human resources person assigned to Naeemullah. Naeemullah's story seems to be based on a slightly skewed version of the record evidence. For example, Naeemullah argues that Budinger was telling lies about him, including one lie that Naeemullah turned up missing while Figliozzi was out of the office. But Figliozzi testified that while he was on vacation, Budinger called him at home, clearly frustrated, to report that he was unable to reach anyone in the Chicago office. Figliozzi testified that he went into the office to see what was going on and discovered that the credit people had all been unavailable. There was an innocent explanation: they were all in business meetings. But the statement that Naeemullah turned up missing was true as far as Budinger knew. Budinger's comment was—at worst—a snide remark made in frustration as a result of an innocent misunderstanding; there is nothing to suggest that Budinger was intentionally trying to interfere with Naeemullah's job when he made the statement.

As further evidence of Budinger's malice, Naeemullah argues that Budinger altered Naeemullah's 1995 performance review. But the only real evidence that Budinger was involved in Naeemullah's 1995 performance review is the fact that Budinger directed Figliozzi to discuss Naeemullah's review with Sacks—hardly conspiratorial given that Sacks was the human resources person assigned to Naeemullah. Naeemullah asks the Court to weave this fact together with the fact that his performance rating was changed (for the better!) to find a tapestry of treachery. We are unwilling to do so. Naeemullah has offered no evidence on which a trier of fact could conclude that Budinger acted maliciously to interfere with Naeemullah's SCO nomination or his job. Rather, the evidence shows that Budinger refused to second Naeemullah's SCO nomination, a move he made within the scope of his employment. To the extent Naeemullah is able to show that Budinger's decision to reject Naeemullah's SCO nomination was discriminatory, Naeemullah may recover under Title VII.

## CONCLUSION

For the reasons explained above, Citicorp's motion for summary judgment on Naeemullah's Title VII claims is denied, and David Budinger's motion for summary judgment on Naeemullah's defamation and tortious interference claims is granted. The case is set for a telephone status hearing on Monday, December 20, 1999 at 9:30 a.m. for purposes of setting a trial date.