Carol SMART, Plaintiff–Appellant,

v.

Christian SIMONSON, David Edelson
and Meryln Niedens,
Defendants–Appellees.

No. 87–3133.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1988.

Decided Feb. 6, 1989.

Rehearing and Rehearing En Banc
Denied March 9, 1989.

Rick M. Schoenfield, Ettinger, Schoenfield & Katz, Ltd., Chicago, Ill., for plaintiff-appellant.

William D. Frazier, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge,
CUDAHY and MANION, Circuit
Judges.

BAUER, Chief Judge.

This case is before us on appeal from the district court's order granting defendants' motion for summary judgment. The plaintiff, Carol Smart, brought suit for damages under 42 U.S.C. § 1983 alleging that he had been held in a mental health institution in violation of his rights. The district court granted the defendants' motion for summary judgment on the basis that they were entitled to qualified immunity. For the following reasons, we affirm.

I.

In 1958, Carol Smart was indicted for the murder of his mother and stepfather. The jury found that Smart was feebleminded and insane and, for that reason, incapable to stand trial. The Christian County, Illinois court entered an order that was, in effect, a judgment on the verdict. The court adjudicated Smart "legally insane by reason of mental retardation or feeblemindedness." The court also ordered that Smart be confined by the Illinois Department of Public Welfare (DPW), later renamed the Department of Mental Health & Developmental Disabilities (DMHDD), "until he shall have entirely and permanently

recovered from his insanity." Under the order, upon Smart's recovery, the DPW was to arrange for the Sheriff to receive Smart and hold him until the court disposed of the murder indictment. Smart was originally committed to the Illinois State Security Hospital in Chester, Illinois. In October of 1968, he was transferred to Dixon Developmental Center.

In July of 1974, Ronald Hodapp of the Dixon Developmental Center petitioned the Lee County Court for an order restoring Smart to competency. The record is unclear with respect to both Hodapp's occupation and his relation to Smart or the case. Attached to Hodapp's petition was an affidavit, signed by Doctor Ryback, a psychiatrist at Dixon, stating that Smart "is able to take care of his own direct needs and may function appropriately under close supervision in the community." On July 31, 1974, the Lee County Court granted the petition to restore Smart to legal competency. The order stated that Smart was now "able to manage his person and estate."

In October of 1975, the Christian County state's attorney petitioned the Christian County court for a Writ of Habeas Corpus ad Prosequendum, directing the Lee County Sheriff to bring Smart to court for a competency hearing. As opposed to the Lee County hearing to determine Smart's competency to handle his own affairs, the Christian County hearing sought to determine Smart's competency to stand trial. On December 27, 1975, the Christian County court found that Smart was unfit to stand trial and remanded him to Dixon. The court also ordered that a civil commitment "hearing be conducted in accordance with the procedures" of the Mental Health Code. This hearing, which should have been held in Lee County, never occurred.

On November 10, 1976, the Christian County court ordered Smart released on his own Recognizance Bond. It also ordered that Smart remain under the supervision of the DMHDD and remain in the hospital for approximately 3 months before transfer to the Village Inn, a half-way house. From November 2, 1977 until March 10, 1978, Smart lived at the Village Inn. He was returned to Dixon after several instances of physical aggression.

On January 3, 1980, Dr. James Magnuson of Dixon wrote a letter to the Christian County court, stating his belief that Smart was no longer incompetent to stand trial. More correspondence between the DMHDD and the court ensued. On September 16, 1980, the court dismissed the murder charges against Smart with leave to reinstate. Thereafter Smart elected to remain as a guest at Dixon until he found another place to live.

In June of 1980, Smart filed this civil rights action against defendants David Edelson, Christian Simonson, and Meryln Niedens. Edelson served as Superintendent of Dixon from 1968 to 1977. Simonson replaced Edelson as Superintendent in 1972 and held that position through plaintiff's final release. He also served as the DMHDD Regional Coordinator for Region IA from 1976 through plaintiff's release. For most of 1968 through 1980, Niedens was the Unit Director of plaintiff's section at Dixon. Plaintiff contends that the defendants violated his constitutional rights by (1) failing to release him after the July 31, 1974 court order restoring his legal competency, (2) failing to provide a hearing for him or alternatively, releasing plaintiff following the December 29, 1975 recommittal order, (3) failing to release him following the November 10, 1976 bond order, and (4) failing to provide him with adequate treatment while he was confined at Dixon Developmental Center.

The district court granted defendants' motion for summary judgment, finding that the defendants were entitled to qualified immunity because defendants' conduct did not violate a clearly established constitutional right. From this decision the plaintiff appeals.

## II.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court refashioned the doctrine of qualified immunity. The Court found that the subjective element of the good faith defense had proven to be incompatible with

its earlier admonition that insubstantial claims against government officials should not proceed to trial. *Id.* at 816, 102 S.Ct. at 2737; see also *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (qualified immunity, similar to absolute immunity, is an entitlement not to stand trial under certain circumstances). To avoid excessive disruption of government and permit resolution of insubstantial claims on summary judgment, the Court defined the entitlement to qualified immunity in objective terms. *Id.* 457 U.S. at 818, 102 S.Ct. at 2738. Thus, a government defendant is entitled to summary judgment based upon qualified immunity as long as his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (citations omitted); *see also, Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.") (citations omitted).

Because of the confusion generated by attempts to apply the "clearly established" standard, *see, e.g., Bensen v. Allphin,* 786 F.2d 268, 275 (7th Cir.1986) ("Although Supreme Court has articulated the rule for qualified immunity, it has not fully explained what it means by the phrase 'clearly established statutory or constitutional rights' ..."), the Supreme Court again looked at the doctrine of qualified immunity in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Recognizing that the operation of this standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," *id.* 107 S.Ct. at 3038, the *Anderson* Court held:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in light of

the preexisting law the unlawfulness must be *apparent.*

*Id.* at 3039 (citations omitted) (emphasis added).

Smart alleges that the defendants violated two of his clearly established constitutional rights. First, he alleges that the defendants violated his due process rights established by *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Second, Smart alleges that the defendants failed to provide him adequate treatment, thereby violating his constitutional right to treatment.

### A.

Smart's first contention on appeal is that the defendants violated his due process rights established by *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). *Jackson* held that a criminal defendant who is committed solely due to his incapacity to stand trial cannot be held more than a reasonable period of time necessary to determine whether there is a substantial probability that he will attain competency in the foreseeable future. *Id.* at 738, 92 S.Ct. at 1858. If it is determined that he will not, the state must either institute civil proceedings applicable to the indefinite commitment of those not charged with a crime, or release the defendant. *Id.*

We initially note that it is unclear whether the rule of *Jackson* applies to the situation in which Smart found himself. Smart, unlike Jackson, was committed because he was found unfit to stand trial and insane. Arguably, the spirit of *Jackson* applies here. *Jackson* addressed the evil encountered by criminal defendants who were committed because they were unfit to stand trial. These people were subject to more lenient commitment standards and more stringent release standards than those people committed under the ordinary civil commitment procedures. Smart was committed under Illinois' *criminal* commitment statute, Ill.Rev.Stat. ch. 38 § 592 (1957), the procedures of which differed from the Illinois *civil* commitment statute, Ill.Rev.Stat. ch. 91½ § 1–1 et seq. (1957). The 1957 civil commitment statute may

have afforded greater procedural protections than the criminal commitment statute and thus an argument can be made that *Jackson* applies here.

On the other hand, the letter of *Jackson* does not apply to Smart's situation. *Jackson* addressed only those persons who were committed because they were unfit to stand trial. Under the Indiana statute at issue in *Jackson* the state had the power to confine a person indefinitely simply because a judge determined that he could not assist in his own defense. The 1957 Illinois statute,[1] on the other hand, required a jury to find that a person was presently insane before the state could confine that person. In reaching its decision, the *Jackson* court relied upon the Illinois Supreme Court's decision in *People ex rel. Myers. v. Briggs*, 46 Ill.2d 281, 263 N.E.2d 109 (1970), which held that a criminal defendant found incompetent, but not insane, should be given the opportunity to stand trial or should be released. Thus one reading of *Jackson* suggests that its due process concerns may be satisfied as long as the state shows that a defendant is not just unfit to stand trial but also insane at the time of commitment.

■ Whether *Jackson*'s protection extends to the situation in which Smart found himself is a question we do not decide today. Even if a *Jackson* violation occurred here, the defendants are entitled to qualified immunity. Defendants authority over Smart, as employees of the DMDHH, was conferred upon them by the 1958 commitment order from the Christian County court. For the purpose of a qualified immunity analysis, this order renders Smart outside the scope of protection created by *Jackson*.

The 1958 order stated that Smart was "legally insane by reason of mental retardation or feeblemindedness." It also stated that the DPW (later the DMDHH) was to confine Smart "until he shall entirely and permanently recover from his insanity." Thus, defendants' authority to hold Smart was based upon two judicial determinations: one, that Smart was unfit to stand trial and two, that Smart was insane. However, *Jackson* explicitly applies only to a criminal defendant committed solely because he is found unfit to stand trial. The 1958 order negates any inference that a *Jackson* violation was or should have been *apparent* to the defendants.

Smart recognizes that the Christian County court order created a factual situation which rendered him outside the ambit of *Jackson*. However, he argues the 1974 adjudication that he was legally competent brought him back within *Jackson*'s ambit. He argues that a finding of competency negated the terms of the 1958 commitment order and put defendants on notice that they were holding him solely because he was unfit to stand trial. Unfortunately for Smart, his argument is explicitly rejected by Illinois law. Under Illinois law, findings of "sanity and competence are separate and distinct matters." *People v. Adams*, 35 Ill.App.3d 810, 343 N.E.2d 659, 663 (1st Dist.1976). Further, a finding of competence does not necessitate a finding of sanity or vice versa. *Id.*, 343 N.E.2d at 663.

From 1958 forward, plaintiff was a mittimus patient and defendants were bound by the terms of the 1958 order. Defendants were entitled to rely upon the terms of that order and, as long as that reliance was reasonable, they are shielded from liability. *See Wilkinson v. Forst*, 832 F.2d 1330, 1342 (2d Cir.1987) ("defendants were justified in an objectively reasonable belief that the court orders authorized ... the searches that were conducted" and thus entitled to immunity); *Sebastian v. United States*, 531 F.2d 900, 903 (8th Cir.1976), *cert. denied*, 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976) (sheriffs who transported plaintiff who had been committed without notice and hearing to mental hospital were immune because of good faith reliance on court order). Throughout Smart's confinement the defendants acted pursuant to the terms of the 1958 order. The 1974 order restoring Smart to civil

1. We note that the statute pursuant to which the court committed Smart was later repealed. It was replaced with Ill.Rev.Stat. ch. 38, article 104 (1965). Unlike section 592 of the 1957 statute, article 104 only required the court to determine whether a defendant was fit to stand trial. This statutory change has no bearing upon Smart's cause of action.

competency does not make defendants' continued reliance on the 1958 order unreasonable.[2] As stated above, a finding of competence will not necessarily lead to a finding of sanity. Further, it appears from the record that the competency hearing was an ex parte proceeding, that the defendants never received notice before the hearing, and most importantly, that the defendants never received a copy of the 1974 order after the hearing.

Smart also alleges that two other events brought him within the ambit of *Jackson*. First, Smart alleges that the defendants should have secured the civil commitment hearing ordered by the Christian County court in 1976. This argument is also explicitly rejected by Illinois law. Under Illinois law, the court is responsible for setting commitment hearings. *See* Ill.Rev. Stat. ch. 91½ § 8–8 (1975) (the court must set the hearing date and must also assure that notice of the hearing is served upon "the respondent, his attorney, and guardian if any, his responsible relatives *and the director of the facility* ") (emphasis added). Even if plaintiff's argument had some merit, we have no idea how the defendant's failure to set a hearing date has any relevance to plaintiff's *Jackson* claim. The second event alleged by Smart to create a *Jackson* violation was the defendant's failure to release Smart pursuant to the 1976 court order. Although it appears that the defendants should have returned to court when Smart was returned to Dixon after several instances of aggression at the Village Inn, we are again baffled by the relevance of this omission to plaintiff's *Jackson* claim.

We find that the district court properly granted summary judgment to the defendants on the basis of qualified immunity. Unlike Jackson, Smart was committed by the Christian County Court to the DMHDD because he was found unfit to stand trial and insane, not simply because he was found unfit to stand trial. Even if a *Jackson* violation were to exist somewhere in this situation, the terms of the committing order negate any inference that a violation of *Jackson* was apparent to the defendants.

## B.

 Plaintiff's other claim on appeal is that the defendants violated his constitutional right to receive treatment while confined by the state. Apart from the fact that plaintiff was not warehoused and did receive some treatment, there was simply no clearly established right to treatment at the time of plaintiff's confinement. *See O'Connor v. Donaldson,* 422 U.S. 563, 573, 95 S.Ct. 2486, 2492, 45 L.Ed.2d 396 (1975) (court stated that there was "no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State"). At the time of plaintiff's confinement, a conflict existed among the circuits over whether a defendant had a constitutional right to treatment. *Compare Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1972), *aff'd in part, rev'd and remanded in part,* sub nom. *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1974) (right to treatment) and *Stachulak v. Coughlin,* 364 F.Supp. 686 (N.D.Ill.1973) (right to treatment) *with Morales v. Turman,* 562 F.2d 993, 997–99 (5th Cir.1977) (holding that right to treatment not firmly established and criticizing view that there should be constitutional right to treatment), *New York St. Ass'n. for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 758–68 (E.D.N.Y.1973) (no right to treatment).

Because the right to treatment was not clearly established at the time of plaintiff's confinement, the district court properly granted summary judgment to the defendants on the basis of qualified immunity.

For all of the above reasons, the order of the district court is

**AFFIRMED.**

---

**2.** We do not hold that reliance upon a court order necessarily shields a defendant from liability. The issue is whether that reliance was reasonable. *Cf. Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (officer cannot rely on search warrant to shield himself from liability if he knows warrant is invalid).