**Richard GREENBERG,
Plaintiff–Appellant,**

**v.**

**Thomas KMETKO and Bruce Weflen,
Defendants–Appellees.**

No. 89–2857.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1990.

Decided January 8, 1991.

As Amended on Denial of Rehearing
and Rehearing En Banc
Feb. 15, 1991.

Ellen R. Domph, Gregory J. Schlesinger, Schlesinger & Krasny, Chicago, Ill., for plaintiff-appellant.

Robert McFarland, Office of the Atty. Gen., Terry Troy, Rich A. White, Chicago, Ill., for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

In 1975 Richard Greenberg, a social worker, made public and private comments critical of his agency. Thomas Kmetko and Bruce Weflen, Greenberg's supervisors, transferred him to the "Title 20 unit", where he spent his time repetitively filling out forms for federal reimbursement. He was stripped of social work responsibility and eventually quit. Defendants stipulated that the Title 20 unit was widely viewed as a punishment unit, and a jury determined that the transfer punished Greenberg for his speech; it awarded substantial damages. The jury also determined that the change of duties (at no loss in pay or benefits) was not a constructive discharge. We held that the defendants are entitled to immunity from liability for their response to Greenberg's private comments, 840 F.2d 467 (7th Cir.1988) (in banc), and remanded to allow the district court to assess the effect of *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), on the claim of immunity from liability for a transfer based on Greenberg's public speech. Both the in banc opinion and the earlier panel opinion, 811 F.2d 1057 (1987), lay out the facts. We spare the reader a repetition.

Our opinion remanding the case identified as potentially dispositive the question whether the law in 1975 clearly forbade transfers on account of protected speech. Greenberg's reassignment was not a "discharge"; the jury's verdict establishes so much. Laurence Peter describes what happened to Greenberg as a "lateral arabesque", shuffling an aggravating employee to a make-work job in another part of the building. Laurence J. Peter & Raymond Hull, *The Peter Principle* 38–39 (1969). (The book gives as an illustration the office manager reassigned "as co-ordinator of interdepartmental communications, supervising the filing of second copies of inter-office memos", *id.* at 39, equivalent to Greenberg's fate.) Judge Parsons, to whom this case was assigned on remand, concluded that lateral arabesques were not clearly unconstitutional in 1975 and entered summary judgment for the defendants. 1989 WL 91842, 1989 U.S.Dist. Lexis 9493 (N.D.Ill.). Greenberg contends that no later than 1968, when *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), came down, it was established that employers could do nothing to discourage protected speech. Transfer to a meaningless job may be an impediment, just as a discharge would be, so Greenberg urges us to reinstate his claim.

Greenberg does not contend that any case, anywhere in the country, had held before his transfer that lateral arabesques should be treated the same as discharges for purposes of the first amendment. "[I]t was not until July 1979 that this circuit specifically held that a job transfer, in contrast to a discharge, could be the subject of a first amendment challenge." *Egger v. Phillips,* 710 F.2d 292, 324 (7th Cir.1983) (in banc) (Cudahy, J., concurring), citing *McGill v. Board of Education,* 602 F.2d 774, 780 (7th Cir.1979). Even 1979 did not end the debate. Our in banc opinion of 1988 remarks that "it is unusual at the very least to even suspect that a government department head cannot transfer a disruptive worker after that employee has gone public with a dispute", 840 F.2d at 474. A year later this court held that there is a constitutional difference between discharging a worker for political views and failing to promote the same person. *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 950–54 (7th Cir.1989) (in banc). We observed that "employment decisions not involving dismissals ... are significantly less coercive and disruptive than discharges", *id.* at 952, and correspondingly easier to support in a constitutional analysis characterized by balancing interests. Four Justices of the Supreme Court agreed, —— U.S. ——, 110 S.Ct. 2729, 2758, 111 L.Ed.2d 52 (1990) (Scalia, J., joined by Rehnquist, C.J., and O'Connor & Kennedy, JJ.), but five disagreed, so our distinction did not survive. Still, the existence of this debate (and close division) in 1990 implies that the game was afoot in 1975.

*Anderson* holds that immunity survives a conclusion that the public officials violated a right stated at a high level of generality—such as the "right of free speech". *That* right was established in 1791 but is too general to be useful. Such a general

statement would do away with immunity, for any plaintiff can point to such a right (the Constitution predates the action being challenged). Principles of immunity stem from the belief that the law should develop in injunctive actions or damages actions against public bodies rather than at personal expense. Illinois indemnifies its employees in many cases, but § 1983 does not allow a distinction between indemnifying states and those that leave employees to fend for themselves—and drawing such a line would be of doubtful benefit to plaintiffs, once states realized that they could protect themselves and their employees by terminating indemnification.

Courts require officials to adhere to rules that have been made specific enough to set operational guidelines. "The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (emphasis added). If *Pickering* had held that no public official may take any personnel action in response to . speech, then Kmetko and Weflen should have known in 1975 that they could not reduce the psychic income Greenberg reaped from his work. *Pickering* is not, however, an absolutist decision. It establishes a balancing approach: public officials may penalize speech that interferes "too much" with the ability of the agency to accomplish its mission. 391 U.S. at 568, 88 S.Ct. at 1734. Ever since, it has been difficult to know just how much is too much. E.g., *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Egger*, 710 F.2d at 313–23. *Pickering* stressed that the speech was unrelated to the job, leaving to subsequent decisions the task of working out the significance of this fact. After *Pickering*, even discharge is permitted if job-related speech cuts too deeply into the efficient administration of public business. Balancing implies a sliding scale: courts may condone responses short of discharge even though they would think sacking an excessive price for the speech in question. So we thought in *Egger*, 710 F.2d at 313–23, an in banc decision

concluding that a transfer from one city to another without loss in pay was not an excessive response to an FBI agent's speech.

No one supposes that Greenberg could collect damages if Kmetko had sneered at him in response to his statements, or if Weflen had icily told Greenberg to mind his own business and assigned him fewer battered children and more routine placements. How much beyond the sneer and cold shoulder is permissible?—was permissible in 1975? There is no logical answer to such a question under a balancing approach. *Pickering* and its sequels stand for the proposition that speech on questions of public interest ought not be deterred too much, or for too little reason, making it almost impossible to formulate bright lines. The employee's interest in speech is the same *qualitatively* whether the response is discharge, transfer without loss of pay, or a supervisor's curled lip. Yet there is a *quantitative* difference between discharge and a lateral arabesque, or between either of these and a snub.

We know today, from *Bart v. Telford*, 677 F.2d 622 (7th Cir.1982), if not from *Rutan*, that a series of little steps to get the goat of the speaker, including failure to invite her to a birthday party, can violate the first amendment. Prescience would have been required to know this in 1975, however. Government has some interest in inducing employees to think about the consequences of their public speech—social workers ought to preserve confidences and speak dispassionately, even if the first amendment allows them to do otherwise. 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. This interest may justify a measured response even if it is not enough to allow the agency to hurl the offender onto the street. Cf. *Huang v. Board of Governors*, 902 F.2d 1134, 1141–42 (4th Cir.1990), and *Volk v. Coler*, 845 F.2d 1422, 1430 (7th Cir.1988), which hold that an employee transferred to an unwelcome job without loss of pay does not suffer a deprivation of "property". Although one can draw lines between the first and fifth amendments (the first does not depend on a deprivation of "property"), what matters for the moment is that many

judges believe that there are differences for constitutional purposes between being fired and being transferred.

Balancing approaches make disagreement inevitable. So, too, it is certain that some judges will rely on the qualitative aspects of the earlier cases (the interest in free speech), while others will emphasize the quantitative aspects (treating the early cases as showing only that there ought not be an "excessive" price tag attached to expression). Five Justices in *Rutan* emphasized the qualitative aspect of *Pickering* and four the quantitative aspect. It could easily have gone the other way. Where the line eventually will be drawn is not predictable at the beginning. Indeed, lines of this kind are unstable; a change in Justices' attitudes about the importance of the speakers' interests and those of the government may produce different outcomes.

Principles of immunity relieve social workers and other staffers from having to decide, at their financial peril, how judges will balance these interests in the years to come. Governmental employees must obey the law in force at the time but need not predict its evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendent.

*Anderson* does "not ... say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful", 483 U.S. at 640, 107 S.Ct. at 3039. It is enough "that in the light of pre-existing law the unlawfulness [was] apparent." *Ibid. Pickering* does not make the proper treatment of a lateral arabesque "apparent", as if the only question were whether people could get their sums right. We did not make the proper treatment explicit until *McGill* in 1979. Judge Cudahy, concurring in *Egger*, thought that a transfer from one city to another without loss of pay in 1978 could not be the basis of damages liability under pre-*Anderson* principles. 710 F.2d at 323–24. As the disagreement among the judges of this court (and the Justices) in *Rutan* shows, questions about the extent to which public employers may take speech into account remain the subject of debate. Immunity lifts from the shoulders of public employees the onus of predicting the outcome of these debates.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I agree generally with the law as analyzed in the majority opinion and I write separately principally to comment on the unusual facts and the unusual procedural history, which make this seem such a difficult and close case. The specific facts are of importance here because the case was remanded by the en banc court for an examination of those facts under *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See Greenberg v. Kmetko & Weflen*, 840 F.2d 467, 473 (7th Cir.1988) (en banc). The facts are also important because the law of qualified immunity, as it has developed in this circuit, has tended to find qualified immunity in almost any case of first impression. *Cf. Landstrom v. Illinois Dept. of Children & Family Servs.*, 892 F.2d 670 (7th Cir.1990) (school officials' investigation of potential child abuse case over objection of parents held immune); *Hedge v. County of Tippecanoe*, 890 F.2d 4 (7th Cir.1989) (county officials immune under section 1983 for questions about sexual history in polygraph-monitored employment interview); *Lenea v. Lane*, 882 F.2d 1171 (7th Cir.1989) (prison officials' reliance solely on polygraph exam to establish prisoner's guilt in disciplinary offense held immune); *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir.1989) (immunity granted in due process claim when officials placed child in home with aunt who sexually abused child, even though officials were warned of potential for abuse), *cert. denied*, —— U.S. ——, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990); *Shields v. Burge*, 874 F.2d 1201 (7th Cir.1989) (during internal investigation, search of police officer's briefcase stored in automobile and his desk protected by immunity from Fourth Amendment claim); *Smart v. Simonson*, 867 F.2d 429 (7th Cir.1989) (employees of state mental institution immune for reliance on court commitment for insanity and incompetence to stand trial as basis for holding patient even in face of later

determination of competency). *But cf. Cleveland–Perdue v. Brutsche*, 881 F.2d 427 (7th Cir.1989) (prison officials not immune for not correcting systematic deficiencies in delivery of health care services), *cert. denied,* —— U.S. ——, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990); *Conner v. Reinhard*, 847 F.2d 384 (7th Cir.1988) (no immunity for retaliatory discharge after plaintiff made statement of "public interest").[1]

The original jury trial in this case was conducted by Judge Grady, but the remand from the en banc court went to Judge Parsons. So far as can be discerned from his opinion on remand, Judge Parsons was aware of no facts beyond those before the original panel and the en banc court. Judge Parsons was therefore apparently in no better position than the en banc court had been to resolve the immunity issue under *Anderson v. Creighton.* In the interest of coherence, if not of brevity, I believe it is necessary to furnish a more complete statement of the underlying facts.

From 1974 until 1978, Greenberg was a social worker with the Illinois Department of Children and Family Services ("DCFS" or "Department"). He worked in the Department's North Area Office located in Chicago. Weflen was the supervisor of the plaintiff's unit after October 1974, and Kmetko was the Area Administrator for the DCFS. Over the course of several years, Greenberg had a number of disagreements with his supervisors over Department policy. He voiced some criticism of Department policy inside the office and some outside of the office. Particularly at issue now are three "outside" statements made by Greenberg in 1975. The first occurred on April 10, 1975, when Greenberg appeared before a judge of the Cook County Juvenile Court to give a status report on a child who had been assigned to

Greenberg. The court had previously ordered the DCFS to place the child in a foster home, but this had not been done. Greenberg informed the court that its order had not been followed and complained that the DCFS policy of minimizing placement services was probably the cause of the Department's noncompliance. The judge became upset and ordered Weflen to appear in court to explain the DCFS's failure to place the child.

The next incident occurred on October 10, 1975, when Greenberg attended a public meeting of the Children's Rights Council, a community interest group. The deputy director of the DCFS spoke, and the meeting attracted several hundred people. During a question and answer period following the address, Greenberg stood up and voiced his objections to the Department's policy of minimizing services and offered as an example of the problems caused by the policy the case of Richard S., a child who had been assigned to Greenberg. Richard S. suffered from psychosis and epilepsy, occasionally demonstrating violent tendencies, and was currently living in Elgin State Hospital. Greenberg complained at the meeting—as he had previously complained to the Department's assistant guardianship administrator—that Richard S. was not receiving adequate medical care. (Greenberg did not mention the child's name.) After the meeting Greenberg approached the deputy director, who assured Greenberg that he personally would contact Greenberg's supervisors about Richard S.'s case.

Dissatisfied with what he perceived as the lack of progress in Richard S.'s case, Greenberg contacted the Legal Assistance Foundation (the "LAF"). The LAF's Juvenile Division was an agency given authority by the Circuit Court of Cook County to receive and monitor information concerning DCFS wards. Greenberg sought to enlist the LAF's assistance in preventing the

---

1. Both on brief and in his petition for rehearing, Greenberg relies heavily on *Benson v. Scott*, 734 F.2d 1181 (7th Cir.1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984). *Benson,* a pre-*Anderson v. Creighton* case, is helpful to Greenberg in its relatively narrow view of qualified immunity. However, it is not clear that Benson was still a state employee when he engaged in the protected speech, and it is there-fore equally unclear whether there was a need to balance the state's interest as an employer against the plaintiff's interest in speech. *Cf. Egger v. Phillips*, 710 F.2d 292 (7th Cir.) (en banc) (FBI agent transferred allegedly in retaliation for complaining to supervisors about coworker; defendant found qualifiedly immune), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

DCFS from discharging Richard S. to a non-medical facility.

Soon after this last incident, Greenberg's supervisors transferred him to a clerical unit known officially as "Title 20," but known among the Department's social workers as a punishment unit and referred to by more colorful epithets, such as "the monkey cage," "the dumping ground" and "the scapegoat unit." Appellant's Br. at 20. Those assigned to Title 20 did no casework, but only filled out government reimbursement forms. Greenberg labels this assignment a demotion, although he suffered no loss of salary or benefits. Kmetko and Weflen say they simply reassigned Greenberg to a job that would be less emotionally and mentally taxing for him. In fact, Greenberg charges that it was the reassignment that adversely affected his mental health. In late July 1976, after an increasing number of absences from work due to his deteriorating mental condition, Greenberg sought a medical leave of absence, based on the recommendation of his psychiatrist. He never returned to work and formally resigned in March 1978.

After resigning, Greenberg filed a two-count complaint against his supervisors based on the reassignment to Title 20. In the first count, he alleged that the DCFS had punished him for exercising his First Amendment right to criticize Department policy. In count II, he alleged that the reassignment amounted to constructive discharge. Prior to trial, the district court heard the defendants' motion for summary judgment based on their claim to qualified immunity. Judge Grady, then presiding over the case, denied the defendants' motion. The case was tried to a jury, which found in favor of the defendants on the constructive discharge claim, but which returned a verdict in favor of Greenberg on the First Amendment claim. The jury awarded Greenberg $150,000 in damages.

On appeal, both the original panel (Judges Cudahy and Fairchild, with Judge Coffey dissenting) and the en banc court (by Judge Coffey) ruled that the defendants *were* entitled to qualified immunity with regard to Greenberg's statements made within the office. 811 F.2d at 1063; 840 F.2d at 472. A majority of the original panel agreed with Judge Grady, however, that the defendants were *not* entitled to qualified immunity based on Greenberg's public statements. 811 F.2d at 1063. After the original panel announced its decision, the Supreme Court issued its opinion in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In light of *Anderson v. Creighton,* the en banc court remanded the case to the district court for a determination whether a reasonable supervisor in 1975 would have thought, given the specific facts of the case, that Greenberg's reassignment was lawful.

While qualified immunity is a question of law for the court to decide, *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988), the facts of this case were unusually complicated, and the en banc court remanded the case, ostensibly because of the district court's superior familiarity with the record, for a determination by the district court of the qualified immunity question. In this procedural respect, the en banc court may have delegated to the district court obligations which it might well have undertaken itself. The en banc court concluded that the district court had erred in its initial resolution of the qualified immunity question primarily by not considering the specific facts of the case. The consideration of the specific facts was an obligation imposed by *Anderson v. Creighton,* and the en banc majority said:

> [W]e conclude that this case must be remanded for reconsideration in light of *Anderson* on the issue of qualified immunity for Greenberg's public statements for the district judge, familiar as he is with the entire record, to apply the new test to it.

840 F.2d at 473.

Although the defendants claimed that Greenberg was reassigned (or "transferred") because of his emotional difficulties, a number of affidavits were submitted by Greenberg's co-workers stating that they considered the transfer a punitive measure.

And at trial there was evidence of this. For example, the following colloquy took place on direct examination of George Neagu, a former administrative assistant of the Cook County Region of DCFS:

Q: Mr. Neagu, in connection with the Title 20 unit, that unit Mr. Greenberg had been placed in, were you aware if that unit had developed any particular reputation at the north area office or beyond it?

\* \* \* \* \* \*

A: There was a stigma from the outset attached to the Title 20 formation and Title 20 unit. It was known as the monkey cage unit in the office in which it was generally believed that the people who were identified as troublemakers in disfavor would be placed.

Record at 195 (Tr. vol. II; testimony of George Neagu).

Other witnesses referred to the reputation of the unit as a "dumping ground for people that they [the administrators] wanted to get ... rid of," Record at 576 (Tr. vol. IV; testimony of Joan Phillips), "punishment unit or a monkey cage unit, scapegoat unit," Record at 605 (Tr. vol. IV: testimony of Paula Erenetta), and "basically a dumping ground, and basically kind of a clerical kind of a unit that really didn't do much," Record at 588 (Tr. vol. IV; testimony of Tom Johnson).

I think, therefore, that for purposes of summary judgment on the issue of qualified immunity, we must assume that the reassignment was punitive or retaliatory at least in part. Of course, as indicated, there had been a jury verdict to this effect earlier.

On remand, Judge Parsons, who, as I have noted, discerned no facts not already well known to this court, found, after reviewing the parties' submissions and "bearing in mind the strict confines within which the Seventh Circuit has instructed [the district] court to review this motion for summary judgment," Mem.Op. at 11, that "a reasonable supervisor [in 1975] could have honestly believed that transferring the plaintiff to the Title 20 Unit was important to staff management and was not illegal nor in violation of the plaintiff's 1st Amendment right in that it was motivated by retaliation for the discomfort his conduct had caused them." *Id.* Despite this and other suggestions of the defendants' possible motives, I continue to think, for purposes of summary judgment, we must assume that these motives were, at least in part, retaliatory and punitive. The sworn testimony of record, the affidavits and the jury verdict make this inescapable. The majority opinion, in fact, seems to me implicitly to concede this.

Given, therefore, that the personnel action taken ("transfer," "reassignment" or whatever) issued from motives of retaliation or punishment, is the result reached by the majority opinion supportable? Although the powerful values protected by the First Amendment make the matter extremely close and debatable, there is no decided case of the Supreme Court or of any of the courts of appeals which made it clear, as of 1975, that this sort of personnel action was of constitutional significance— however motivated. That this kind of action might be extraordinarily upsetting to a person of the plaintiff's temperament seems not to be controlling. The cases in this circuit seem to turn more on the nature of the actions taken rather than on the motive or purpose underlying them, although this is a matter not fully worked out in the case law. For example, in one case we held that:

For purposes of the "offense" ... plaintiffs' supported allegations are assumed true, including intent. Once those allegations demonstrate a constitutional violation, the issue of intent is put aside. Then the "defense" (qualified immunity) is analyzed without any reference to intent, as mandated by *Harlow* [*v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ]. Intent is relevant to the threshold question of whether the defendant violated plaintiffs' constitutional rights but is ignored for a question of whether that right was "clearly established" at the time of the incident. ...

Thus under *Harlow* the district court must conduct a two-part analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established

at the time in question? ... Intent is relevant to (1) but not to (2).

*Wade v. Hegner,* 804 F.2d 67, 69–70 (7th Cir.1986); *see also Auriemma v. Rice,* 910 F.2d 1449, 1452 (7th Cir.1990) (en banc) ("The objective determination in these [qualified immunity] cases requires that courts not consider intent when making the final determination at summary judgment of whether the law is clearly established."). *Cf. Rakovich,* 850 F.2d at 1210 (intent, for *Harlow* purposes, is irrelevant except when an element of the cause of action "because evaluating intent would be a factual analysis, whereas the objective inquiry is a legal question").[1]

Greenberg argues with a great deal of force that *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), involving the discharge of a teacher, established that a public employer could not retaliate against an employee who chose to exercise her First Amendment right to speak out on matters of public concern. And in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court declared:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

408 U.S. at 597, 92 S.Ct. at 2697.

But both *Pickering* and *Perry* involve the loss of a job and are not closely analogous to reassignment to a task of lesser quality—no matter how demeaning or upsetting. Perhaps, this is a distinction that *Anderson v. Creighton* does not intend us to make, but it is a distinction that appears to follow the line of analysis of cases in

this circuit following *Anderson v. Creighton.* Compare *Cygnar v. City of Chicago,* 865 F.2d 827, 842–44, 846 (7th Cir.1989) (racial and political discrimination in job transfer not clear constitutional violation; qualified immunity granted), *with Swank v. Smart,* 898 F.2d 1247, 1256–57 (7th Cir.) (due process violation of firing policeman without opportunity to rebut charges held clearly established; qualified immunity denied), *cert. denied,* —— U.S. ——, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990). *Cf. Auriemma,* 910 F.2d at 1452–60 (immunity granted officials for demotion of police officers in count alleging race violation of 42 U.S.C. § 1985(3) but denying immunity for race discrimination and First Amendment retaliation counts).

More importantly, perhaps, Judge Coffey, in the opinion for the en banc court remanding the matter for findings under *Anderson v. Creighton* (from which Judges Fairchild, Ripple and I dissented), made the following statement:

> We also note that the case at hand does not involve the firing of a worker; rather, the plaintiff Greenberg was merely transferred to an administrative division of the department without incurring a loss of pay. We think it is unusual at the very least to even suspect that a government department head cannot transfer a disruptive worker after that employee has gone public with a dispute and by doing so "bought" himself an alleged First Amendment claim.

840 F.2d at 474.

This seems to establish a law of the case of sorts, which may be inconsistent with a denial of qualified immunity, at least in a situation where no additional facts have been found on remand. I believe that this statement guided Judge Parsons in his determination on remand.

Based on the evidence and argument presented here, the reassignment or transfer of Greenberg could have been motivated by a desire to retaliate for his First

---

1. A distinction must presumably be kept in mind between a subjective belief that an act is a constitutional tort and the subjective elements of the tort itself. *Harlow* expressly addresses the first of these mental states but not the sec-

ond. But from the point of view of the easy availability of summary judgment, the need to resolve subjective matters of any kind presumably presents the same problem.

Amendment activity, or concern for his mental health or simply by a desire to put him in an "inside" job where he would have less opportunity to embarrass the DCFS. Or there could have been a combination of these motives and others that have not been mentioned. It would be difficult ever to plumb these institutional motives with great assurance. Since the question of qualified immunity is usually decided on a motion for summary judgment, there may be practical reasons to de-emphasize motive as a decisive factor in that determination. In earlier times, I believe that there was a greater inclination to commit these questions to jury verdict but this seems less the case since *Harlow* and *Rakovich*.

The majority opinion cites my concurrence in *Egger v. Phillips*, 710 F.2d 292, 323–24 (7th Cir.) (en banc), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), as authority for the proposition that a "transfer" would have enjoyed qualified immunity in 1975. Of course, at issue in that case was Egger's "transfer" from Indianapolis to Chicago and his failure to report for work there, quite a different circumstance than an alleged reassignment to a "punishment unit" as is the case with Greenberg. To equate these "transfers" is to paint with a broad brush indeed—something that *Anderson v. Creighton* seems to counsel against. On the other hand, if summary judgment is to be the usual mode of disposition, there may be a case for taking a view which does not emphasize detailed distinctions.

I think this is a very close case and the public interest in protecting bureaucrats against the consequences of derailing the careers of whistleblowers is not so clear to me as to the majority. Nonetheless, I cannot say with confidence that the result reached by the majority opinion is incorrect under the case law.